WILLIAM RABUN, GOVERNOR, FOR THE USE OF TAYLOR, TAX

COLLECTOR, vs. FOWLER AND OTHERS.

### Debt.

Where an action is brought on the official bond of a Sheriff in the name of the Governor of Georgia, in being, who is individually designated, and such Governor dies pending the action, it is not necessary to amend the suit, by the substitution of the name of his successor.

Can such bond be put in suit, without the previous order of the Judge of the Superior Court— *Quære.*

### By CHARLTON, Judge.

THE facts and circumstances of this case, are substantially these :

*Fowler*, the defendant, being elected Sheriff of McIntosh county, executed a bond with sureties, (before the Justices of the Inferior Court of that county, which bond in its original shape appears on the minutes of that Court, or some other book in which its proceedings and acts are recorded,) to *Peter Early*, then Governor of the State of Georgia, for the faithful performance of official duty, and in such terms, as will appear by a reference to the said bond.    Whilst discharging the duties of Sheriff, —— *Taylor*, the plaintiff, who sues under the protection of the then Governor of this State, delivered to the Sheriff sundry tax executions to a considerable amount, taking his receipt therefor.    The Sheriff, *Fowler*, failing to collect the sums specified in the executions, or having collected, to pay them over, this action was instituted against him and his sureties on his official bond, executed and recorded before mentioned.    On the demise of *Peter Early* and the subsequent accession to the Government Department, of *William Rabun*, the action was brought in his name as " Governor of Georgia."

A verdict at this term was rendered for the plaintiff, for the full

amount of the Sheriff's receipt to the Tax Collector, with leave given to the defendant's counsel, to move to set it aside and enter a nonsuit.

*Davies* and *Berrien* now support the motion upon these grounds : 1*st.* That the demise of *William Rabun*, since the institution of the action, rendered it necessary to substitute by proper process the name and style of the Governor of Georgia, in office after such demise, and in office at the trial of the cause : 2*ly.* That without this substitution, the action must abate, the physical character and legal style of the Executive Department, as a sole corporation, or analogous to it, not being otherwise preserved, and the style known to the constitution and the law, must be preserved in suits, where it is necessary to be used.

It was urged as illustrative of the objections thus assumed, that in the nature of things there could be no material difference in a suit of this character, and one between individuals, A. and B. ; and that official actions or suits, brought in the name of a public functionary, were subject and liable to similar principles, incidents and mutations. On the death of a plaintiff, a new party must be made, for the purpose of maintaining consistency in the record. It is equally proper and important, in the present case ; for if the judgment is sufficient to be entered up, and execution issued, in the name of *William Rabun*—*his* physical and official demise being a fact of notoriety, and which this Court is bound to notice *ex officio,* an absurd and incongruous variation would present itself between the declaration, the verdict, judgment, and execution, falsifying the whole record, particularly in the execution, which could not issue, in the name of *William Rabun.*

*Wayne* and *Pelot* of counsel for the plaintiff contended, that " *William Rabun*" might be rejected as surplusage, and then the words " *Governor of Georgia,*" which immediately follow, complied with all the requisites urged as necessary, on the other

side. The action might then proceed to its consummation, very legally and properly, in the style of the moral personage, or corporation, lending its aid, as in this instance, to a public officer. It was also added, that it was always usual to take official bonds in the name of the then acting and existing Governor, and not required afterwards, upon his natural and political demise, to amend the writ, according to the matter of fact, at the period of issue and trial. By one of the counsel it was further urged, that the Executive Department as a sole corporation was immortal—something like the perpetuity given to the British King, and therefore there was no rational necessity for the mutations alluded to in the argument of the counsel for the defendants. At all events, the objection of defendant's counsel, had no connexion with the real merits and substantial justice of the case.

Upon the points involved in this case, I have no local adjudications to direct me, at least they have not been communicated. I must, therefore, decide this motion, upon such lights as a reference to our statutes, and the arguments of counsel have afforded me.

The objections in support of the motion, may be jointly considered ; for, if the name of the Governor in being is a necessary and component part of the legal style, to be used in an action of this nature, the motion must be sustained—there appearing then a radical, incurable variation, between the writ and the bond sued ; and besides, all the consequences would follow, in relation to the subsequent record, as mentioned by the defendant's counsel.

I shall refer first to our constitution and statutes, which have a direct bearing on the points made, and 2ly, apply the doctrines and principles of cases, as I find them in English authorities.

1st. The 11th Sect. of the Constitution of Georgia, Art. III. directs, that " Sheriffs shall be appointed in such manner as the General Assembly may by law direct," and designates the tenure of office.

The Act of the General Assembly appoints Sheriffs through an election of the people. The Judiciary Act of 1799, tit. Sheriff, Sect. 46, declares, "that before any Sheriff shall enter upon the duty of his appointment, and being commissioned by the Governor, he shall be bound for the faithful performance of his duty by himself and his deputies, before any of the said judges, (meaning by said judges as explained by Act. May 11, 1803, *Clayton's Dig.* 112, "every Judge of the Superior or a majority of the justices of the Inferior Courts") to the Governor of the State for the time being, and to his successors in office jointly and severally, with two good and sufficient securities, inhabitants and freeholders of the county, to be approved of by the justices of the Inferior Court or any three of them, in the sum of 20,000 dollars." There is here no ambiguity. The bond must be taken in the name of the Governor then in being, and is transmitted to his successors, for the benefit of all persons aggrieved by the misfeasances of the Sheriff.

There may be some analogy, between the King's prerogative of immortality, and that existence given to the Executive Department, by the will of the people, as promulgated in the Constitution. The *Governor* cannot die, so long as we retain the Executive, as a co-equal, and co-ordinate department of the government, within the limits prescribed by the Constitution. I am not disposed, however, to consider the Executive Department, as a "sole corporation" in the sense and with all the incidents and attributes given to that class of corporations, by the English law. Except the *King*, who derives his station and powers from any other source perhaps than that of the governed, all other corporations sole or aggregate, (generally speaking) are created by him. In the acceptation of British jurisprudence, the King is a sole corporation, by virtue of hereditary descent, or title to the throne. That title is derived from his race, and dynasty, and with the prerogatives which encompass him, render him something more than

[Rabun, Governor, for use, &c. vs. Fowler, et. al.]

a co-equal branch of the monarchy. His impeccability and other attributes, place him according to my view of the English government, above the level of parliament, clothed even as it is said to be, with its boasted omnipotence. It is different with our Executive Department. It was called into existence by the voice of the sovereign people, with powers so limited and clearly defined as not to be misunderstood, powers, which may be restricted or enlarged by constitutional amendments—powers, which may be annihilated, and the Department with them, without subverting republican institutions. These revolutions, fluctuations and vicissitudes, to which the Executive Department may be subjected, without totally disorganizing the nature, genius and principle of our system of liberty, show that a department thus created, is essentially variant from that theoretical or practical corporation, denominated "*sole*" by British jurisprudence. It would be possible for *us* to breathe freely in *our* political atmosphere, without it; but diminish the established and antiquated prerogatives of Majesty, or render them subservient to the purposes of mere pageantry, and you tumble into ruins the whole British monarchical fabric. Really, or technically, I cannot therefore attach the idea of a "sole corporation," to the Executive functions. The only analogy between that department, and the Kingly authority is, that neither expires by the natural dissolution of the person filling the one, and exercising the other. The question then recurs, whether the death or demise of the person, discontinues suits, or renders necessary some process for their recommencement, or continuation, under the British or our system of laws. The common law, did require a re-commencement of actions in the King's Courts upon the death of the King. To that extent were blended his physical and political existence. But the inconveniences resulting from this construction of the legal effects of the King's demise, produced the statutes of *Ed.* vi. c. 7, 7 and 8 vo., 3. cap. 27, sec. 21. and 1. *Ann* st. 1. cap. 8. sect. 5th.

If this case should again present itself, under any other aspect, these statutes will occupy my particular attention. It is sufficient on this occasion to observe, that by these statutes the death of the King would not give birth to the effects as have been attempted to be applied to the demise of *William Rabun.* Our law directs that the bond shall be given, (or which is the same thing) that the Sheriff " shall be bound for the faithful performance of his duty to the Governor for the time being, and to his successors in office." It was then necessary, that the bond should be taken in the name of *Peter Early*, the " Governor in being," and his successors in office. The insertion of the name of the " Governor in being," can be considered, as directed for no other purpose than the ascertainment of an epoch from which the Sheriff dates the official investiture. The adjunct " Governor of Georgia" separates the natural, and moral personage, and complies with both the Legislative and Constitutional requisitions, for, the judicial act, only requires that the Sheriff should be bound to the " Governor in being, and his successors in office," and the Constitution requires, no other style than " Governor." Upon this ground, therefore, the name of *William Rabun* may be either rejected as surplusage, or more correctly retained as a mere designation of the " Governor in being," transmitting to any successor, the character of *plaintiff* as GOVERNOR of the State of Georgia. With these impressions, my opinion is, that this case may advance to judgment, and execution, without amendment of the writ, and substitution by any species of order, or process, of the name of the now Governor in being.

This case involves other points, I feel it my duty to dispose of, because they were deemed important by counsel. It was objected that there could be no nonsuit in this case, because there was not that discrepance between the declaration and the evidence, which would warrant it. *Prima facie,* there certainly appeared a sufficient variance between the *allegata* and *probata* to justify my

PART I.—I.

allowance of the rule to shew cause, and I readily availed myself
of it, for the purpose of giving that deliberate opinion, which
could not be expected in a *nisi prius* adjudication—for, almost
every decision of the Court, must partake of that character, amid
the hurried business of the circuit.   I will never compel a plain-
tiff to suffer a *nonsuit*, who has offered proofs in support of his
action.   If he answers upon being called, I agree with the Court,
in the case of *Irving* vs. *Taggart*, 1st Sergt. and Rawl. Reports
360—that the Clerk is not authorized to record a nonappearance,
nor can the plaintiff be considered in contempt.   He may insist
on the verdict.   This American decision is supported by English
authorities.   *Pochin* vs. *Powley*, 1 Blk. Rep. 670, 2 Term Rep.
275, 1 Term Rep. 176, (see also the allusion to Judge *Buller's*
opinion by *Tilghman*, C. J. in the above case of *Irving* vs. *Tag-
gart*, and by another American case cited by *Yates J. Girrard*
vs. *Gettig*, 2 Binn. 234, in the same case of *Irving* vs. *Taggart*.)

In the present case, a *verdict* was rendered for the plaintiff, and
the rule to shew cause, why it should not be set aside, and a *non-
suit* entered, acquiesced in by counsel, as the best arrangement
for a deliberate decision upon its important principles.   This case
was also assimilated to an information *qui tam*—*William Rabun*,
the then Governor in being, suing for the satisfaction of *Taylor*,
the Tax Collector.

The rule is that the " King cannot be nonsuit in any *action* or
information, in which he is sole *plaintiff*."   " But it seems (con-
tinues the same authority) that any informer *qui tam*, or plaintiff,
in a popular action, may be *nonsuit*, and thereby wholly deter-
mine the suit, as well in respect of the King, as himself"—*Abr.
Bac.* p. 202, 203, and the cases or authorities there cited.

The plaintiff in this case does not resemble a *relator*, prosecu-
ting as he does, for indemnity under the wings and auspices of the
Governor.   Still the analogy of principle would hold me out in

directing (if a verdict is not insisted upon) a nonsuit against him; because, the suit is for his benefit—(the individual plaintiff)—and destroys the idea of that ubiquity, or always presence of the Executive, presumed on the demand of a public right, in its capacity, as sole plaintiff. And this analogy would further warrant a nonsuit against the plaintiff in this cause, did not the judicial and statutatory regulation, prescribing the manner in which the Sheriff's official bond should be taken, render unnecessary the insertion of the name of every new Governor, brought into office, by death, resignation or election, from the commencement, to the period of trial, to consumation of the suit. But for this regulation, and the reasons before assigned, that form of proceeding would be required. The Governor of Georgia, though not, as before observed, strictly or technically, a *sole corporation*, yet in the absence of such regulation by statute, in relation to suits, would be considered *quasi* a sole corporation, and the death of the individual filling and representing that corporation has been ruled; " a good plea in abatement, for a new successor comes in his place, that was not party to the former writ"—The result would be the same, upon the death of an individual of an aggregate corporation (invisible as it is) whose christian and sirname have been used in the writ, and therefore, none of the individuals composing the aggregate corporation are thus designated in suits. The proper and safest course is to sue in the style given by the charter to the aggregate corporation, (2 *Inst.* 666, *Skin.* 2 pl. 2, cited in 1 *Bac. Abr.* 503, title *corporation.*)

In this view, without a reference to the Judicial Act of 1799, the objection of the defendant's counsel assailed me with great force, and occasioned the hesitancy, which has furnished leisure for this investigation.

Another difficulty not suggested by counsel pressed itself upon my mind, and of which I must confess it is not divested. I mean

the order of the Judge of the Superior Court to put this bond in suit, for the satisfaction of the public, or persons aggrieved by the misconduct of the Sheriff.  Without such order can a suit of this nature be instituted ?  Did not the Legislature intend, that the expediency of it, should rest upon the exercise of a sound discretion of the Judge—he being satisfied as a pre-requisite, that the public or a citizen, had been aggrieved by the misconduct of the Sheriff?  The propriety, if not the necessity of this order must appear extremely obvious, for the purpose of designating the *aggrieved* party.  If I mistake not, it is the duty of the Sheriff, to receive from the tax collectors, " all executions which may be tendered to him," and to make returns of his proceedings and levies within specified periods, according as these levies may affect personal or real estate.  If such is his duty, does the Tax Collector become responsible for the Sheriff's delinquency, when he merely complies with the law in tendering or delivering to him the tax executions ?  Under such circumstances can the State look exclusively to the Tax Collector for the defalcation, leaving him to seek indemnity, and to obtain it as well as he can (under Executive patronage,) against the Sheriff and his securities?  These questions might have presented themselves to the mind of the Judge on the application for the order to put the official bond in suit : and is it not possible, that the Judge considering the Sheriff exclusively responsible might also have ordered this suit in the name of his Excellency for the satisfaction of the *public ?*  This order was not exhibited to me, and the cause must of course progress under the expression of these doubts, and these embarrassments.  The objection, however, has not been made by counsel, but I feel it a duty, as a requisite of law *to state* it now, as it may probably have some hearing upon an ulterior discussion.

*It is ordered,* that this motion to set aside the verdict, with leave to enter a nonsuit, be, and is hereby *over ruled,* and that the defendants, *nunc pro tunc,* have leave to appeal within fifteen

[Rabun, Governor, for use, &c. vs. Fowler. et. al.]

days from this date : or, to move within that time, to set aside the verdict, giving three days notice to the opposite counsel, upon such other legal and sufficient grounds as may be sustained by the Court. *And it is further ordered,* that execution be stayed for that period.

DAVIES AND BERRIEN for the motion—WAYNE AND PELOT against it.